[Crim. No. 1092.   Second Appellate District, Division Two.—April 1, 1925.]

## THE PEOPLE, Respondent, v. J. M. EDWARDS, Appellant.

[1] CRIMINAL LAW—MOTION IN ARREST OF JUDGMENT—ORDER DENYING—APPEAL—DISMISSAL.—An order denying a motion in arrest of judgment, not being an appealable order, must be dismissed.

[2] ID.—LARCENY—TAKING OF PROPERTY.—To constitute larceny the first essential is that there be a "taking"; that is, the thing which is the subject of the crime must be taken from the possession of the owner into the possession of the thief.

[3] ID.—CHARACTER OF TAKING—FRAUD.—The taking, in order to support a charge of larceny, must be against the will of the owner or at least without his consent; in other words, the act of taking must be a trespass against the owner's possession, and though the taking must be against the will of the owner or a trespass to his possession, still an actual trespass or actual violence is not necessary, as fraud may take the place of force.

[4] ID.—POSSESSION BY FRAUD AND TRICKERY.—A taking, within the definition of larceny, occurs when a person, with a preconceived design to appropriate the property to his own use, obtains possession of it by means of fraud or trickery; and in such case the fraud vitiates the transaction, and the owner is deemed still to retain a constructive possession of the property.

[5] ID.—POSSESSION—TITLE—INTENT.—It is essential in cases of larceny committed by means of fraud that the owner shall intend to part with the possession only, and not to pass the title as well. If he intends to pass both the possession and the title, the transaction, though it may amount to the crime of obtaining property by false pretenses, will not constitute larceny.

[6] ID.—DELIVERY OF PROPERTY FOR PARTICULAR PURPOSE—CONVERSION—INTENTION—TITLE.—The owner does not part with the title to the alleged thief where the thing which is the subject of the theft is delivered by the owner to the accused to be applied by the latter to a particular purpose, and the recipient of the prop-

---

1. See 8 Cal. Jur. 493.

3. Obtaining property by trick or fraud with intent to steal as larceny, note, 8 Ann. Cas. 287. See, also, 17 R. C. L. 13.

5. Distinction between larceny and obtaining money under false pretenses, note, 2 Ann. Cas. 1010.

6. Appropriation of property after obtaining possession by fraud, note, 26 A. L. R. 381. See, also, 17 R. C. L. 15.

erty, having obtained the possession fraudulently with the pre-conceived intention to appropriate the property to his own use, does subsequently convert it to his own use instead of applying it to the purpose contemplated by the owner.

[7] ID.—CORRUPTION OF OFFICERS—DELIVERY OF MONEY—EVIDENCE.— In a prosecution for grand larceny committed by means of fraud and trickery, an implied finding by the jury of a "taking" was justified, where the evidence and inferences therefrom showed that the complaining witness delivered a sum of money to defendant upon the latter's representation that it would be used in some manner to corrupt officers investigating criminal charges against the husband and brother-in-law of the complaining witness, that the representation was false, and that the possession of the money was obtained with a preconceived design not to devote the same to the purpose for which it was delivered to defendant but to convert it to his own use.

[8] ID.—ASPORTATION.—The second essential element in the crime of larceny is the asportation of the thing which is the subject matter of the offense. That is, the taking must be followed by such a carrying away or asportation as to supersede the possession of the owner for an appreciable interval of time, be it ever so short. To constitute asportation the thing must have been in the entire or absolute possession of the taker.

[9] ID.—CONVERSION—INTENTION—ASPORTATION.—Where the accused acquires possession of a thing by fraud or trickery, intending when he acquired the possession not to devote the thing to the purpose for which it was delivered to him but to convert it to his own use, his subsequent conversion of it to his own use, though it be but for the smallest appreciable length of time, is such a complete, independent and absolute possession and control of the thing, adverse to the rights of the owner, as to be tantamount to that asportation which occurs in those cases where the original taking and carrying away involved an act of trespass by actual violence.

[10] ID.—CONVERSION—FINDING—EVIDENCE.—In such prosecution, the implied finding of the conversion of the money by defendant was supported, where the defendant, when he acquired possession of the money, took it with the preconceived intention to convert it to his own use, and then, after so taking it, put it in his pocket

---

8. What constitutes asportation, note, 21 **Ann. Cas.** 856; 29 **L. R. A. (N. S.)** 38.

What amounts to asportation which will support charge for larceny, note, 19 **A. L. R.** 724. See, also, 17 **R. C. L.** 19; 15 **Cal. Jur.** 905.

and drove away from the scene, there being nothing to indicate that his intention to convert it to his own use ever wavered.

[11] ID.—POSSESSION BY FRAUD OR TRICKERY.—Where the possession of property was originally obtained by fraud or trickery, the wrongdoer holds the property all the while without right, and against the right and without the consent of the owner.

[12] ID.—FRAUDULENT POSSESSION—FELONIOUS INTENT.—The rule is that when to possession fraudulently acquired there is added the felonious intent—that is, the purpose to deprive the owner of his property wholly and permanently, without color of right or excuse, and to make it the property of the taker without the owner's consent—the larceny is from that moment complete.

[13] ID.—THING TAKEN MUST BELONG TO ANOTHER.—The third essential element in the crime of larceny is that the thing taken and carried away should be the property of another. That is, someone other than the taker must have in the thing taken a general or special property right which is invaded by the trespass committed in the taking.

[14] ID. — OWNERSHIP AND POSSESSION — SYNONYMOUS TERMS.—Considered as an element of larceny, "ownership" and "possession" may be regarded as synonymous terms; for one who has the right of possession as against the thief is, so far as the latter is concerned, the owner.

[15] ID.—TITLE TO MONEY IN PARTY OTHER THAN PROSECUTING WITNESS—EFFECT OF.—In such prosecution, it was no legal consequence that the legal title to the bills delivered to the defendant was in a third party, where the complaining witness had the right of possession as against the defendant, and the latter acquired possession by fraud and chicanery and held the money without right; and the complaining witness' possession, though the bills may have come into her hands illegally, was sufficient to make them the subject of larceny, and the ownership was properly laid in her.

[16] ID.—FELONIOUS INTENT.—The fourth and last essential of larceny is the felonious intent. That is, the taking and carrying away must be with an intent, without claim or pretense of right or justification, to deprive the owner of his property wholly and permanently; and where no actual trespass or act of violence is involved in the original taking, the felonious intent must exist at the time of the taking.

---

14, Right to possession of person from whom thing stolen as affecting crime of larceny, note, 13 Ann. Cas. 495. See, also, 15 Cal. Jur. 899.

16. Intent as essential to crime of larceny, note, 51 Am. Rep. 312. See, also, 15 Cal. Jur. 906, 908.

[17] ID.—INTENT—EVIDENCE.—In such prosecution, if the jurors believed (and on appeal it must be assumed they did) the testimony of the witnesses for the prosecution, they were warranted in deducing the inference that defendant, when the bills were delivered to him by the complaining witness, took them and carried them away with the intention, then or previously fully conceived, to convert them to his own use as soon as he should obtain their possession, and to exclude the complaining witness from all further dominion over them. Such purpose, amounting as it did to an intent permanently to deprive the owner of her property without any claim or pretense of right or justification therefor, constituted the requisite felonious intent.

[18] ID. — EFFECT OF VERDICT OF NOT GUILTY OF TWO COUNTS ON THIRD COUNT.—In such prosecution, where the defendant was charged with three counts involving three separate and distinct transactions—transactions which were alleged to have occurred on different dates and to involve the theft of different sums of money, and the evidence was sufficient to justify the verdict of guilty on the third count, the fact that the jurors found him not guilty on the first and second counts does not warrant a reversal as to the third count.

[19] ID.—FAVORABLE JUDGMENT—RIGHT TO COMPLAIN.—A defendant cannot complain where the determination of his case was more favorable to him than the evidence warranted.

[20] ID.—GRAND AND PETIT LARCENY—AMENDMENT OF SECTION 487, PENAL CODE—JURISDICTION.—In such prosecution, the fact that at the time the information was filed section 487 of the Penal Code, as amended, made the amount of the theft involved in the third count petit larceny, did not deprive the superior court of jurisdiction, where the offense charged in said count was committed prior to the effective date of the amendment and under the section, prior to the amendment, the theft of the amount involved constituted grand larceny, a felony.

[21] ID.—SECTION 329, POLITICAL CODE—STATUTORY CONSTRUCTION.—There is nothing in section 487 of the Penal Code, as amended, to indicate an intention to interfere in any manner with the punishment of any offense previously committed, or with the procedure relating to the trial of such offense; and the amended section must, therefore, be construed in connection with section 329 of the Political Code, and when so construed, the effect is virtually to add to section 487, as amended, a proviso declaring in substance that the amendment shall not affect the penalty incurred for any offense previously committed.

[22] ID.—REDUCTION OF CHARGES AGAINST RELATIONS OF PROSECUTING WITNESS—REASON FOR—TESTIMONY BY DEPUTY DISTRICT ATTORNEY—RELEVANCY OF.—In such prosecution, testimony by a deputy

district attorney showing that he was responsible for reduction of charges of grand larceny against the complaining witness' husband and brother-in-law to charges of petit larceny because the value of the property involved in the charges was found to be less than fifty dollars, was relevant and material, where there was evidence warranting the inference that defendant in receiving the money from the complaining witness would seek so to influence the investigating officers that if the husband and brother-in-law were not ultimately released they at least would be required to answer for only such charges as carried the least possible punishment, and defendant introduced the court records to show that the charges of grand larceny were reduced to accusations of petit larceny.

[23] Id.—Time of Reduction of Charges—Effect upon Testimony. In such prosecution, such testimony by the deputy district attorney was not rendered objectionable by the fact that the reduction in the charges against the husband and brother-in-law of the complaining witness was made subsequently to the defendant's arrest and after the date when he was alleged to have committed the last act of larceny.

[24] Id.—Larceny—Value—Instruction.—In such prosecution, there was no error on the part of the trial court in instructing the jury that, so far as the present case was concerned, grand larceny was committed when the property taken was of a value exceeding fifty dollars.

[25] Id.—Purpose of Delivery of Money—Instruction.—In such prosecution, no prejudicial error resulted from the trial court's refusal to give defendant's requested instruction to the effect that if the jurors believed that the complaining witness gave defendant the money mentioned in the third count of the information in recognition of his efforts in her behalf, they should find him not guilty, where the fact that defendant would be entitled to an acquittal if the money was intended to compensate him for any aid he may have rendered the complaining witness is a proposition which must be apparent to every person of common intelligence and experience, and where the substance of the requested instruction was set forth in the court's charge, the jury having been expressly instructed that it would not be larceny if defendant received the money pursuant to a promise that the complaining witness would pay him for his efforts in behalf of her husband.

[26] Id.—Instructions.—It is not reversible error to refuse an instruction which merely directs the attention of the jury to that which every intelligent man or woman on the panel would doubtless keep in mind without being reminded of it by the court.

[27] Id.—Title—Instructions.—In such prosecution, defendant's requested instruction (which was refused) to the effect that if

the prosecuting witness gave the money to defendant "with the understanding that he was to do with it as he saw fit in accomplishing the desired purpose," then it must be held that she intended to pass the title, and in that event defendant could not be found guilty of larceny, was not a rigorously accurate statement of the law for the reason that if, when the prosecuting witness parted with the possession of the money, it was her purpose that it should be used by defendant to bribe the officers but that he should do so in a manner which he saw fit, the title would remain in her until the accomplishment of the purpose for which she gave him the money, i. e., until its final delivery by defendant to the officers whom she was led to believe were to be bribed.

[28] ID.—EVIDENCE—INSTRUCTION.—In such prosecution, the rejection of defendant's requested instruction to the effect that if the prosecuting witness gave defendant the money to prevent the filing of additional complaints against her husband and brother-in-law the jury had the right to consider that fact and the further fact that no additional criminal complaints were filed, and that if the consideration of these two circumstances raised a reasonable doubt in their minds as to defendant's guilt he should be acquitted, was justified upon the ground that such instruction was calculated to mislead the jury, whose duty it was to consider, not alone the circumstances especially singled out and specifically referred to in the requested instruction, but every circumstance in the case which might have a legitimate bearing upon the question of whether defendant had secured possession of the money by fraudulent representations.

[29] ID.—ACCUSATORY STATEMENTS—INSTRUCTION.—In such prosecution, a part of defendant's requested instruction to the effect that accusatory statements made in the presence of an accused which are not denied by him are admissible in evidence solely for the purpose of enabling the jury to know his attitude in the face of such statements, and that such statements are not evidence of the truth of the matters stated therein, was correct as an abstract proposition; but the instruction was rendered objectionable by its concluding sentence which implied that defendant denied all of the accusatory statements made in his presence, when such was not the case.

[30] ID.—INSTRUCTIONS.—In such prosecution, error was not committed by the trial court in refusing defendant's requested instruction to the effect that if the prosecuting witness, before testifying in the case, had been informed by the district attorney that she had committed a felony for which she could be sent to the penitentiary, that fact could be considered by the jury in weighing her testimony; and that "if, from a consideration of

such statements, if you find such statements were made, or a reasonable doubt is aroused in your mind as to the guilt of the defendant, then you should acquit him."

(1) 17 C. J., p. 34, n. 49.    (2) 36 C. J., p. 747, n. 7.    (3) 36 C. J., p. 751, n. 63, 64, p. 759, n. 7.    (4) 36 C. J., p. 760, n. 30. (5) 25 C. J., p. 657, n. 25; 36 C. J., p. 777, n. 13, p. 778, n. 26. (6) 25 C. J., p. 657, n. 25.    (7) 36 C. J., p. 905, n. 53, p. 912, n. 42. (8) 36 C. J., p. 748, n. 8, p. 750, n. 38 New.    (9) 36 C. J., p. 749, n. 32.    (10) 36 C. J., p. 912, n. 42.    (11) 36 C. J., p. 760, n. 30. (12) 36 C. J., p. 771, n. 43.    (13) 36 C. J., p. 756, n. 62, 63.    (14) 36 C. J., p. 757, n. 82.    (15) 36 C. J., p. 757, n. 82 New, p. 758, n. 4 New.    (16) 36 C. J., p. 761, n. 58, p. 771, n. 55, p. 772, n. 62. (17) 17 C. J., p. 226, n. 74 New; 36 C. J., p. 899, n. 34, p. 915, n. 92.    (18) 16 C. J., p. 1107, n. 28; 17 C. J., p. 358, n. 46, p. 362, n. 95 New.    (19) 17 C. J., p. 362, n. 94.    (20) 16 C. J., p. 151, n. 64; 36 C. J., p. 800, n. 1.    (21) 36 C. J., p. 800, n. 1.    (22) 36 C. J., p. 878, n. 60, p. 888. n. 48.    (23) 36 C. J., p. 878, n. 60, p. 888, n. 48.    (24) 36 C. J., p. 933, n. 99.    (25) 16 C. J., p. 963, n. 21.    (26) 16 C. J., p. 963, n. 21, p. 1063, n. 85.    (27) 36 C. J., p. 779, n. 29.    (28) 36 C. J., p. 937, n. 40.    (29) 16 C. J., p. 1045, n. 39.    (30) 16 C. J., p. 1013, n. 46.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Charles S. Crail, Judge.    Affirmed.

The facts are stated in the opinion of the court.

Randall, Bartlett & White and A. P. G. Steffes for Appellant.

U. S. Webb, Attorney-General, John W. Maltman, Deputy Attorney-General, and John L. Flynn for Respondent.

FINLAYSON, P. J. — Defendant was convicted of the crime of grand larceny.    He appeals from the judgment and from an order denying him a new trial.    [1] He also appeals from an order denying his motion in arrest of judgment, but as that is not an appealable order the appeal therefrom must be dismissed.

By an information containing three counts defendant was charged with three separate acts of grand larceny.    In the first count he was charged with the larceny of $500 on July 2, 1923; in the second count with the larceny of $250 on

July 5, 1923, and in the third count with the larceny of $150 on July 27, 1923. In each instance the money was alleged to be the property of one Frances Benoit. Defendant was acquitted of the offenses charged in the first and second counts and was convicted of the crime charged in the third count. It was from the judgment of conviction on that count that he appeals. He claims: (1) that the verdict of guilty is contrary to law and to the evidence; (2) that the court erred (a) in admitting certain evidence over his objection, (b) in giving a certain instruction and (c) in refusing to give certain instructions requested by him.

An outline of the case, sufficient for an understanding of the points raised, may be stated thus: It was the theory of the prosecution that possession of each of the three sums of money was obtained from Mrs. Benoit by fraud and trickery. It seems that Mrs. Benoit's husband and the latter's brother had been arrested for grand larceny prior to the first act of larceny with which defendant was charged. Mrs Benoit's testimony, epitomized and reduced to narrative form, is substantially this: I had known defendant for about nine years. A few days after the arrest of my husband and brother-in-law I called upon defendant at his home in Los Angeles. I told him that "the boys" were not guilty, and that I was worried over their arrest. I pleaded with him to help me. He said he would do the best he could, and would let me know later what could be done. At our first conversation defendant told me that it possibly would cost me something, but that he did not know how much. He asked me who the investigating officers were. I described them to him as well as I could. From the description which I gave he said that they were officers B—— and K——. I saw defendant again the next day. At this second conversation he said he would be able to assist me, but that it would cost me $1,000. I told him I did not have that amount, but I managed to get $500 of it at that time and gave it to him. (It is this sum of $500 which is described in count one as the subject matter of defendant's first alleged act of larceny.) I asked him how he was going to help me. He said that the case was in the hands of the investigating officers and that it would depend upon the evidence produced by them "as to how many counts and how much would be put against my husband." He said that "the less that was brought up against the boys the less they would have to answer for, or something to that effect."

I asked him how he was going to use the thousand dollars. He said that it was not necessary for me to know—that he would use his own judgment in disposing of the money; that all that was necessary for me to do was to give it to him. He told me that he did not want any compensation for his services, that he was doing it merely for friendship's sake, "and that the money that I would give him would simply be to compensate the officers or the other parties interested, other than himself." Later he told me that he had seen the necessary people. Meanwhile I had telephoned to my sister for money, and she wired me $500. I gave defendant half of it—$250. (It was for the alleged theft of this sum that the charge in count two was made.) Defendant said he would trust me for the rest. He assured me that he was not going to use any of it for himself, but I told him that sometime I would compensate him with something for helping me. I asked him again what he was going to do with the money, and he said I would have to leave it to his judgment—that it was not necessary for him to tell me. I understood the money had to be used to compensate the different officials that had something to do with the case against my husband and brother-in-law, for not prosecuting them. In a later conversation I had with defendant I asked him if he could not get the boys out of jail entirely. He said he did not know, but that he would try. He said that the investigating officers were the ones who had entirely to do with the cases against my husband and brother-in-law, and that what they said went. He assured me at every conversation I had with him that none of the thousand dollars was to be for him—that he did not need it and did not want it.

The next sum which Mrs. Benoit testified she gave to defendant—the $150 referred to in the third count—was delivered by her to him, according to the testimony of the People's witnesses, under the following circumstances: Mrs. Benoit, it seems, had paid her husband's attorney the sum of $250. When she paid the attorney, she told that gentleman that she needed the money—that she needed it to give to defendant. The attorney replied that if she really stood in need of the money he would pay it back to her in a few days. Accordingly, on July 27, 1923, the day of defendant's arrest, the husband's attorney, who meanwhile had revealed to the district attorney Mrs. Benoit's intention to deliver the money to defendant, repaid to Mrs. Benoit an amount

equal to the sum which she had paid him. The money thus repaid to Mrs. Benoit consisted of certain bills, aggregating $250, the denominations whereof had previously been noted by the officers who subsequently arrested defendant, though Mrs. Benoit does not seem to have had any inkling of that fact or of the fact that the district attorney had been notified of her intention to hand the money over to defendant. Indeed, there is nothing to indicate that Mrs. Benoit had any reason to believe that the bills which her husband's attorney delivered to her represented anything other than a sum of money to which she was lawfully entitled, although the officials had taken the bills from the treasury of the county of Los Angeles for the purpose of facilitating the entrapment of defendant. It seems that the district attorney, who was using the county's money for the purpose, had turned the bills over to the husband's attorney, who, in turn, delivered them to Mrs. Benoit, the latter evidently supposing the attorney was simply returning to her the sum of $250 which she previously had paid to him and which he had promised to repay if she needed the money to make up the balance of the $1,000 which she had told the attorney she had agreed to deliver to defendant.

Mrs. Benoit's testimony regarding her last payment to defendant is substantially as follows: After receiving the $250 from my husband's attorney I called defendant on the phone and arranged to meet him in front of the county jail. He arrived there in his automobile. When we met I asked him if I could keep $100 of the amount to pay some debts. He said I could, and I then delivered him $150 in bills—bills which I had received from my husband's attorney.

Mrs. Benoit, it seems, delivered the bills to defendant while seated in his automobile with him. After handing the money over to him she stepped from the car, whereupon defendant drove a short distance from the scene, with the bills in his possession, when he was arrested by the officers. Defendant, testifying as a witness in his own behalf, denied that Mrs. Benoit had paid him either the $500 or the $250—the amounts mentioned in the first and second counts of the information, and which, according to Mrs. Benoit's testimony, were the first and second payments which she made to defendant on account of the total sum of $1,000 which she said she had agreed to deliver to him. As to the $150, defendant admitted receiving this sum from Mrs. Benoit on

July 27, 1923, in the form of bills, but testified that it was paid to compensate him for certain legitimate efforts which he claimed to have made on Mrs. Benoit's behalf in an honorable endeavor to assist her husband and brother-in-law.

Each of the two officers who had been deputed by their superiors to investigate the charges of larceny pending against Mrs. Benoit's husband and brother-in-law testified that at no time did defendant approach him with an offer of a bribe to induce him to refrain from preferring additional charges against the two brothers.

Defendant put in evidence the court records of the proceedings in the cases pending against Mrs. Benoit's husband and brother-in-law. These records showed that an information had been filed in the superior court against each of the accused whereby each was charged with the crime of grand larceny; that each of them pleaded not guilty to that charge, and that subsequently each was permitted to withdraw his plea and to plead guilty to petit larceny. A deputy district attorney was then permitted to testify, over defendant's objection, that it was his duty to pass upon the dismissal of criminal cases and upon the reduction of charges of higher offenses to charges of lesser degree; and that the reason why the charges against Mrs. Benoit's husband and brother-in-law had been reduced from grand larceny to petit larceny was that the value of the property involved in the charges against the two brothers was found to be less than fifty dollars. Defendant objected to this testimony upon the ground that it was incompetent, irrelevant, and immaterial, and upon the further ground that the reduction of the charges occurred subsequently to defendant's arrest and after the date when he is alleged to have committed the last act of larceny.

Appellant earnestly insists that, with respect to the $150 for the theft of which he was convicted, none of the essential elements of larceny was shown to exist. Because of the earnestness with which this claim is presented we shall take up each element of the offense and show how the evidence warranted the jury in inferring the existence of each essential ingredient of the crime.

[2] To constitute larceny the first essential is that there be a "taking." (18 Am. & Eng. Ency. of Law, 2d ed., p. 468.) That is, the thing which is the subject of the crime must be taken from the possession of the owner into the

possession of the thief. [3] The taking, in order to support a charge of larceny, must be against the will of the owner or at least without his consent. In other words, the act of taking must be a trespass against the owner's possession. (Id., p. 469.) Though the taking must be against the will of the owner or a trespass to his possession, still an actual trespass or actual violence is not necessary. Fraud may take the place of force. [4] It is well settled that a taking, within the definition of larceny, occurs when a person, with a preconceived design to appropriate the property to his own use, obtains possession of it by means of fraud or trickery. In such case the fraud vitiates the transaction, and the owner is deemed still to retain a constructive possession of the property. (17 R. C. L., pp. 13, 14.) Or, as has been said, "the fraud will supply the place of trespass in the taking, and so make the conversion felonious." (*People* v. *Shaw,* 57 Mich. 403, [58 Am. Rep. 372, 24 N. W. 121].) [5] It is essential in such cases that the owner shall intend to part with the possession only, and not to pass the title as well. If he intends to pass both the possession and the title, the transaction, though it may amount to the crime of obtaining property by false pretenses, will not constitute larceny. [6] But the owner does not part with the title to the alleged thief where the thing which is the subject of the theft is delivered by the owner to the accused to be applied by the latter to a particular purpose, and the recipient of the property, having obtained the possession fraudulently with the preconceived intention to appropriate the property to his own use, does subsequently convert it to his own use instead of applying it to the purpose contemplated by the owner. (36 Cor. Jur., pp. 778, 779; *People* v. *Delbos,* 146 Cal. 734 [81 Pac. 131]; *People* v. *Shwartz,* 43 Cal. App. 696 [185 Pac. 686].) Thus in *People* v. *Shwartz, supra,* we held it to be larceny where money is fraudulently obtained by the defendant for the ostensible purpose of using it to bribe a public official, but instead of devoting it to that purpose he converts it to his own use. In cases of that character the accused receives only the possession of the money, while the title remains in the owner until the money shall have been delivered by the defendant to the official whom the owner supposes is to be bribed by the defendant as the corrupting intermediary.

[7]  Tested by the foregoing it must be held that the evidence in this case was sufficient to justify the implied finding of a "taking" sufficient to constitute larceny. According to the testimony of the complaining witness, the $150 was a part of the larger sum of $1,000 which appellant represented to her would be used by him for the purpose of bribing the investigating officers. True, appellant told Mrs. Benoit that it was not necessary for her to know how he was going to use the money; but it is a reasonable inference from all of his statements to her that he intended her to understand that the money was to be used by him in some way to corrupt the investigating officers, though it was not necessary for her to know precisely how it was to be thus used.

While it is true that Mrs. Benoit testified that she told appellant that she expected sometime to compensate him for the efforts which she supposed he had made on behalf of her husband and brother-in-law, her testimony is to the effect that she did not give him the $150 as compensation for any services, but that she delivered that sum to him solely for the purpose of enabling him to carry out his representation that he could and would bribe the investigating officers.

That appellant's representations were false, and that when he obtained possession of the money it was his intention to convert it to his own use and not to devote it to the purpose for which he ostensibly was receiving it, are facts which well may be inferred from the testimony of each of the investigating officers to the effect that at no time had appellant approached him with a corrupt suggestion. It will be recalled that Mrs. Benoit testified that appellant told her that these two officers were the men "who had entirely to do with the case against my husband and brother-in-law, and that what they said went." These facts warrant the inference that the possession of the $150 was obtained by appellant from Mrs. Benoit by fraud, with a preconceived design not to devote the money to the purpose for which it was delivered to him but to convert it to his own use—in short, that there was a "taking," within the law of larceny.

[8]  The second essential element in the crime of larceny is the asportation of the thing which is the subject matter of the offense. (18 Am. & Eng. Ency. of Law, 2d ed., p. 496.) That is, the taking must be followed by such a carrying away

or asportation as to supersede the possession of the owner for an appreciable interval of time, be it ever so short. (Id., p. 498.) To constitute asportation the thing taken must have been in the entire or absolute possession of the taker. (Id.) **[9]** Where, as in the instant case, the accused acquires possession by fraud or trickery, intending when he acquired the possession not to devote the thing to the purpose for which it was delivered to him but to convert it to his own use, his subsequent conversion of it to his own use, though it be but for the smallest appreciable length of time, is such a complete, independent and absolute possession and control of the thing, adverse to the rights of the owner, as to be tantamount to that asportation which occurs in those cases where the original taking and carrying away involved an act of trespass by actual violence. Here appellant, when the money was delivered to him by Mrs. Benoit, had its entire and absolute possession for an appreciable period of time before his arrest, and during that interval he converted it to his own use.

**[10]** Appellant strenuously insists that the evidence affords no warrant for the implied finding of a conversion. With this contention we cannot agree. After having accepted the money, appellant put it in his pocket and drove away from the scene. As we have pointed out, there is evidence to support the implied finding that at the time when he acquired possession of the money he took it with the preconceived intention to convert it to his own use. He was, therefore, a wrongdoer from the beginning, and in contemplation of law the wrongful act was continuous. **[11]** In cases such as this, where the possession was originally obtained by fraud or trickery, the wrongdoer holds the property all the while without right, and against the right and without the consent of the owner. (*State* v. *Coombs,* 55 Me. 477 [92 Am. Dec. 610].) There is nothing to indicate that appellant experienced a change of heart after he received the money—there is nothing to indicate that his intention to convert it to his own use ever wavered. The reasonable inference is, therefore, that when he received the money into his possession he took it and carried it away with the intention to keep it as his own. The conversion was then complete. It matters not how short the interval may have been between the manual taking of the money and its conversion to appellant's use. In fact, these acts were

practically simultaneous in their occurrence. If the testimony of the People's witnesses be true—and with respect to the charge in the third count we are bound to accept it as true, in view of the nature of the verdict—appellant took the bills into his possession, put them in his pocket and drove away with them, intending all the while to appropriate them to his own use. The very instant that he did this there was a conversion of the money. [12] The rule is that when to possession fraudulently acquired there is added the felonious intent—that is, the purpose to deprive the owner of his property wholly and permanently, without color of right or excuse, and to make it the property of the taker without the owner's consent—the larceny is from that moment complete. (*State* v. *Coombs, supra.*)

[13] The third essential element in the crime of larceny is that the thing taken and carried away should be the property of another. (18 Am. & Eng. Ency. of Law, 2d ed., p. 498.) That is, someone other than the taker must have in the thing taken a general or special property right which is invaded by the trespass committed in the taking. [14] Considered as an element of larceny, "ownership" and "possession" may be regarded as synonymous terms; for one who has the right of possession as against the thief is, so far as the latter is concerned, the owner. (36 C. J., p. 757.) [15] Since appellant acquired possession of the money by fraud and chicanery, he held it all the while without right, and as against him Mrs. Benoit had the right of possession. (*State* v. *Coombs, supra.*) It is of no consequence that the legal title to the bills was in the county. The actual status of the legal title to the stolen property is of no concern to the thief. Mrs. Benoit's possession, though the bills may have come into her hands illegally, was sufficient to make them the subject of larceny, and the ownership was properly laid in her. (*State* v. *Pigg*, 80 Kan. 481 [18 Ann. Cas. 521, 103 Pac. 121]; 36 C. J., p. 758.)

[16] The fourth and last essential of larceny is the felonious intent. (18 Am. & Eng. Ency. of Law, 2d ed., p. 500.) That is, the taking and carrying away must be with an intent, without claim or pretense of right or justification, to deprive the owner of his property wholly and permanently. (Id.) And where, as here, no actual trespass or act of violence is involved in the original taking, the felonious intent

must exist at the time of the taking. (*People* v. *Marino*, 85 Cal. 515 [24 Pac. 892]; 15 Cal. Jur., p. 908.) [17] If the jurors believed the testimony of the witnesses for the prosecution—and on this appeal we must assume they did—they were warranted in deducing the inference that appellant, when the bills were delivered to him by Mrs. Benoit, took them and carried them away with the intention, then or previously fully conceived, to convert them to his own use as soon as he should obtain their possession, and to exclude Mrs. Benoit from all further dominion over them. Such purpose, amounting as it did to an intent permanently to deprive the owner of her property without any claim or pretense of right or justification therefor, constituted the requisite felonious intent.

Our conclusion from the foregoing is that the evidence was sufficient to warrant the jury in finding the existence of each and every element of the offense charged against appellant in the third count of the information.

[18] It is earnestly urged that the verdict of guilty on the third count is repugnant to and wholly inconsistent with the verdicts of not guilty on counts one and two, and that, therefore, the verdict on the third count is contrary to law. We cannot accept the contention thus earnestly made. The several counts in the information relate to three separate and distinct transactions—transactions which were alleged to have occurred on different dates and to involve the theft of different sums of money. It may be conceded, for the purpose of the argument, that under the evidence the jury had as much reason for finding appellant guilty on the first and second counts as it had for finding him guilty on the third; but even so, the fact remains that the evidence was sufficient to justify the verdict on the third count, and we must conclude that the jurors were convinced of his guilt thereon. If the jurors paltered with their oaths and with the law they must make their own peace with conscience. If appellant was wrongfully acquitted on the first and second counts the error was in his favor, and he cannot be heard to complain. The fact that the jurors relieved him on two counts does not oblige this court to relieve him on the third. (*State* v. *Hund,* 115 Kan. 475 [222 Pac. 766]; *State* v. *Brown,* 114 Kan. 699 [220 Pac. 174]; *State* v. *Brundige,* 114 Kan. 849 [220 Pac. 1039]; *Weinecke* v. *State,* 34 Neb.

14 [51 N. W. 307]; *Griffin* v. *State,* 18 Ohio St. 438; *Boone* v. *United States,* 257 Fed. 963 [169 C. C. A. 113]; *Carrignan* v. *United States,* 290 Fed. 189.) In the case last cited it is said: "A verdict that is apparently inconsistent affords no basis for reversal of a judgment predicated thereon, when the evidence is sufficient to support either of two separate offenses." Addressing himself to a like objection advanced by the defendant in *Boone* v. *United States, supra,* Judge Trieber expresses the view of the court thus: "It is a well-known fact that juries frequently hesitate to return verdicts of guilty on a large number of counts, when the punishment which may be imposed on each count is as severe as that provided for violation of this statute (the minimum punishment on each count is five years). They therefore satisfy their consciences by a verdict of guilty on one or two counts, and not always on the counts supported by the strongest evidence." In *State* v. *Brundige, supra,* the court says: "Undoubtedly the defendant was guilty of both burglary and larceny, or he was not guilty of either. But the failure to convict him of larceny as well as of burglary was an error in his favor, of which he cannot effectively complain." [19] It is the settled law of this jurisdiction that a defendant cannot complain where the determination of his case was more favorable to him than the evidence warranted. (*People* v. *Coulter,* 145 Cal. 69 [78 Pac. 348]; 8 Cal. Jur., p. 563.)

[20] It is claimed that the superior court had no jurisdiction to try appellant on the offense charged in the third count for the reason that when the information was filed, October 13, 1923, section 487 of the Penal Code had been so amended that, when read in connection with the following section, the theft of property the value of which does not exceed two hundred dollars is declared to be petit larceny. The offense of which appellant was found guilty was committed prior to August 18, 1923, the date when the amendment became effective. On July 27, 1923—the date when appellant committed larceny of the $150—the crime was grand larceny; for section 487, as it then read, made it grand larceny to steal and carry away property having a value in excess of $50. Therefore, at the date of the commission of the offense charged in the third count the theft of the bills was a felony punishable by imprisonment in the state prison

—a crime of which the superior court has jurisdiction.    [21]
There is nothing in section 487, as amended, to indicate an
intention to interfere in any manner with the punishment
of any offense previously committed, or with the procedure
relating to the trial of such offense.    The amended section
must, therefore, be construed in connection with section 329
of the Political Code.    When so construed, the effect is vir-
tually to add to section 487, as amended, a proviso declaring
in substance that the amendment shall not affect the penalty
incurred for any offense previously committed.    (*People* v.
*McNulty,* 93 Cal. 427, 440 [26 Pac. 597, 29 Pac. 61]; *People*
v. *Davis,* 67 Cal. App. 210 [227 Pac. 494].)    From this it
follows that notwithstanding section 487 had been amended
at the time when the information was filed, appellant never-
theless was liable to the punishment which the law provides
as the penalty for grand larceny.    His offense, therefore,
was a felony, and the superior court had jurisdiction.    To
sustain his contention appellant cites *People* v. *Tisdale,* 57
Cal. 104.    But, as pointed out by Mr. Justice McFarland in
the McNulty case (93 Cal. 440 [26 Pac. 597, 29 Pac. 61]),
the reasoning of the Tisdale case is no longer applicable, sec-
tion 329 of the Political Code having been amended in an
important particular since that case was decided.

[22]    It is claimed that the court erred in permitting
the deputy district attorney to testify as to his reason for
reducing the charges of grand larceny against Mrs. Benoit's
husband and brother-in-law to charges of petit larceny.    It
is urged that this testimony was irrelevant and immaterial.
The objection is based upon the assumption that appellant's
representations to Mrs. Benoit amounted to no more than
statements that he would use the money to prevent the filing
of additional charges, and not that he would use it to bring
about a reduction of the charges then pending.    But Mrs.
Benoit, as we have shown, testified that appellant told her
"that it would depend entirely upon the evidence produced
by the investigating officers as to how many counts *and
how much* would be put against my husband," and that
"the less that is brought up against the boys the less they
would have to answer for"; also that he told her that he
would try "to get the boys out of jail entirely."    This tes-
timony warrants the inference that appellant intended that
Mrs. Benoit should understand him to mean that he would

seek so to influence the investigating officers that if the husband and brother-in-law were not ultimately released they at least would be required to answer for only such charges as carried the least possible punishment. Moreover, if it was appellant's understanding that Mrs. Benoit's testimony meant that his representations to her amounted to no more than a statement that he would use the money merely to prevent the filing of additional charges, it may pertinently be asked what his purpose was in introducing the court records to show that the charges of grand larceny were reduced to accusations of petit larceny. If he did not intend that the jurors should be inoculated with the idea that he had carried out his part of the compact by causing a reduction to be made in the charges as originally brought, then why did he introduce these records in evidence? It was incumbent upon the prosecution to show that the several sums of money delivered to appellant were not used by him to accomplish the purpose for which he received them. The action of the deputy district attorney in accepting pleas of guilty to petit larceny, if not explained by that officer, might well have warranted the jury in finding that appellant had in fact used the money in the manner he had agreed. The testimony, therefore, was relevant and material.

[23] It is claimed, however, that the testimony is objectionable upon the further ground that the reduction in the charges was made subsequently to appellant's arrest and after the date when he was alleged to have committed the last act of larceny. There is no merit in this contention. If the money had been applied by appellant to the purpose for which he ostensibly received it, and if as a result thereof he had corruptly brought about the acceptance of pleas of guilty to the lesser charges, it would be possible for his initial act of corruption to have occurred long before the men were permitted to plead guilty to petit larceny. If the district attorney's acceptance of these pleas had in fact resulted from appellant's corrupt use of the money, the train of events which led thereto might readily have been put in motion by an act of corruption initiated by appellant, and, so far as he is concerned, consummated by him, long before his arrest and prior to the commission of the last act of larceny with which he was charged.

[24] It next is claimed that the court erred in charging the jury that, so far as the present case is concerned, grand larceny is committed when the property taken is of a value exceeding $50. For reasons already stated, the recent amendment of section 487 of the Penal Code did not operate to bar the punishment which previously had been prescribed for acts of larceny committed before the amendment became effective. Hence appellant, if guilty as charged in the third count, was punishable as for grand larceny, and the court therefore very properly charged the jury that, so far as this case is concerned, grand larceny is committed when the value of the property taken exceeds $50.

[25] We find no prejudicial error in the rejection of the instructions requested by appellant. The first refusal of which appellant complains is that of an instruction to the effect that if the jurors believed that Mrs. Benoit gave defendant the $150 in recognition of his efforts in her behalf, they should find him not guilty. That appellant would be entitled to an acquittal if the money was intended to compensate him for any aid which he may have rendered Mrs. Benoit is a proposition which must be apparent to every person of common intelligence and experience. [26] It is not reversible error to refuse an instruction which merely directs the attention of the jury to that which every intelligent man or woman on the panel would doubtless keep in mind without being reminded of it by the court. (8 Cal. Jur., p. 631.) Moreover, the substance of the requested instruction was set forth in the court's charge, the jury having been expressly instructed that it would not be larceny if defendant received the money from Mrs. Benoit pursuant to a promise that she would pay him for his efforts in behalf of her husband.

[27] Appellant requested, and the court refused, an instruction to the effect that if the prosecuting witness gave the money to defendant "with the understanding that he was to do with it as he saw fit in accomplishing the desired purpose," then it must be held that she intended to pass the title, and in that event defendant could not be found guilty of larceny. This requested instruction is not a rigorously accurate statement of the law. It does not necessarily follow that the title would pass to appellant if the money was given to him "to use as he saw fit *in accomplishing the desired pur-*

*pose.*" The "desired purpose" for which the money was given by Mrs. Benoit was the corruption of the investigating officers. If, when Mrs. Benoit parted with the possession of the money, it was her purpose that it should be used by appellant to bribe the officers but that he should do so in a manner which he saw fit, the title would remain in her until the accomplishment of the purpose for which she gave him the money, i. e., until its final delivery by appellant to the officers whom she was led to believe were to be bribed. (*People* v. *Delbos, supra; People* v. *Shwartz, supra;* 36 Cor. Jur., pp. 778, 779.) It is a reasonable inference from Mrs. Benoit's testimony, considered in its entirety, that bribery was the only purpose to be accomplished by appellant's use of the money, even though in accomplishing that purpose he was to use the money "as he saw fit."

[28] Appellant requested an instruction to the effect that if Mrs. Benoit gave him the money to prevent the filing of additional complaints against her husband and brother-in-law the jury had the right to consider that fact and the further fact that no additional criminal complaints were filed, and that if the consideration of these two circumstances raised a reasonable doubt in their minds as to defendant's guilt he should be acquitted. This instruction was calculated to mislead the jury, whose duty it was to consider, not alone the circumstances especially singled out and specifically referred to in the requested instruction, but every circumstance in the case which might have a legitimate bearing upon the question of whether appellant had secured possession of the money by fraudulent representations. The requested instruction is based upon the erroneous notion that appellant's representations, as testified to by Mrs. Benoit, amounted to no more than statements by him that he would use the money to prevent the filing of additional charges. Appellant erroneously assumes that his representations, as testified to by the complaining witness, entirely excluded any idea that he was to use the money to secure a reduction in the pending charges. But, as we already have pointed out, the complaining witness testified that appellant told her that "the less that was brought up against the boys the less they would have to answer for"—language well calculated to lead Mrs. Benoit to believe that it was appellant's intention to use the money to bring about a reduction of the pending

charges as well as to prevent the filing of additional complaints.

[29]  Another of the instructions requested by appellant, but refused by the court, would have charged the jury to the effect that accusatory statements made in the presence of an accused which are not denied by him are admissible in evidence solely for the purpose of enabling the jury to know his attitude in the face of such statements, and that such statements, are not evidence of the truth of the matters stated therein.  As an abstract proposition, this part of the requested instruction is a correct statement of the law.  The vice of the instruction is in its concluding sentence, where we find these words: "Therefore, I instruct you that if the denial by the defendant of the accusatory statements made in his presence, taken in connection with all the other facts and circumstances of the case, create a reasonable doubt in your mind, then you should acquit the defendant."  This language assumes a fact not borne out by the evidence.  It implies that appellant denied all of the accusatory statements made in his presence.  Such, however, is not the case.  Some, at least, of the statements made in his presence were neither admitted nor denied by him.  When asked what he had to say as to some of them he replied, "I have nothing to say."

[30]  Appellant requested the court to give an instruction to the effect that if Mrs. Benoit, before testifying in the case, had been informed by the district attorney that she had committed a felony for which she could be sent to the penitentiary, that fact could be considered by the jury in weighing her testimony; and that "if, from a consideration of such statements, if you find such statements were made, or a reasonable doubt is aroused in your mind as to the guilt of the defendant, then you should acquit him."  If this language means anything it means that the defendant should be acquitted under either of these two alternatives: (1) if the jury found that such statements were made to Mrs. Benoit by the district attorney; or (2) if a reasonable doubt be aroused in the jurors' minds as to defendant's guilt.  Manifestly, appellant would not necessarily be entitled to an acquittal if the jury found the first alternative to be true.  The mere fact that Mrs. Benoit had been advised by the authorities that she had committed a crime and was threatened with punishment therefor would not necessarily invalidate all

of her testimony. Moreover, the court gave an instruction as follows: "You are instructed that if you believe from the evidence that the prosecuting witness was promised certain immunity for her husband or herself, then such fact is a circumstance which may be considered by you in determining her credibility." This instruction went as far as the court could possibly be expected to go in singling out a particular witness and advising the jury as to what circumstances might be considered by it in weighing her testimony.

We find no substantial error in the record. Appellant had a fair trial, and there is sufficient evidence to support the verdict.

The appeal from the order denying defendant's motion in arrest of judgment is dismissed. The judgment and the order denying a new trial are affirmed.

Works, J., and Craig, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 28, 1925.

All the Justices concurred.